**Jerry L. ROSS, Plaintiff–Appellee,**

v.

**BLACK & DECKER, INCORPORATED, a foreign corporation, Defendant– Appellant.**

**No. 91–2670.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1992.

Decided Oct. 21, 1992.

Rehearing and Rehearing En Banc Denied, Dec. 2, 1992.

Laird M. Ozmon, James P. Stevenson, John T. Kelly, Kelly & Kleczek, Joliet, Ill., David A. Novoselsky (argued), Novoselsky & Associates, Chicago, Ill., for plaintiff-appellee.

Russell P. Veldenz, Algimantas P. Kezelis (argued), John A. Culver, French, Kezelis & Kominiarek, Chicago, Ill., for defendant-appellant.

Before CUDAHY and COFFEY, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

COFFEY, Circuit Judge.

In July 1990, Jerry L. Ross, an Illinois resident, filed a products liability suit in an Illinois state court against the defendant Black & Decker, Inc. ("B & D"), a corporation with its principal place of business in Maryland. Ross sought damages for an injury sustained while operating a power saw manufactured by the defendant. B & D removed the state action to federal district court pursuant to 28 U.S.C. § 1441(a), invoking the court's diversity jurisdiction. A jury found B & D liable for Ross' injury, and awarded him $2,000,000 in compensato-

ry damages and $10,000,000 in punitive damages. B & D urges reversal of the jury verdict and damages award on numerous grounds. The parties agree that Illinois law is the substantive law governing this case. We affirm the jury's finding of liability against B & D and its award of $2,000,000 in compensatory damages to Ross, and vacate the jury's punitive damages award as excessive.

## I. Factual Background

On May 4, 1983, Ross, a brick-layer and part-time handyman, was using a DeWalt 10 inch Power Miter Box electrical saw designed, manufactured and sold by B & D, to cut a piece of wood for window trim. Ross had placed the lumber on the floor to make a right-handed 45 degree cut. Ross used his right hand to operate the saw's trigger handle while holding the piece of wood with his left hand. A stationary metal enclosure prevented inadvertent contact with the upper portion of the saw blade. A clear plastic guard extending down along and parallel to the left side of the saw prevented contact with the blade on the left side position, and moved upward when it came in contact with the wood. The lower right side of the saw blade was barren of any such safety device. Because the saw had its own base on which to place the wood to be cut, it could be used on the floor as well as on a table. The saw could also be operated with either hand on the trigger handle while using the other hand to secure the workpiece.

After Ross finished making his cut, he released the saw's power trigger with his right and reached for the piece of wood with his left hand. He testified that as he "started to get up, my [left] hand rolled, I guess, or drifted into the blade." According to Dr. Eloff Eriksson, the plastic surgeon who later operated on Ross, the contact with the still-rotating blade "almost completely severed [Ross' left] hand from the forearm at the level of the wrist." Only a narrow "skin bridge" and three tendons remained connecting the forearm to the hand. Dr. Eriksson stated that "all function in the hand [was] lost and the hand was dangling on that strip of skin and three tendons.... Functionally, this injury was essentially the same as a complete amputation because the majority of the structures were divided...." Dr. Eriksson realigned the bones in Ross' injured hand by driving pins through the bones and into the forearm, and surgically repaired the severed tendons. With the use of micro-surgical instruments he was able to re-attach and re-activate the severed blood vessels and nerves. A nerve from Ross' lower leg was removed and grafted into a missing gap in the median nerve of his left hand. After surgery, Ross underwent a course of rehabilitation therapy which lasted more than a year.

An expert witness for the plaintiff, Dr. Hatem Galal, a plastic surgeon who examined Ross' injured hand and conducted an occupational therapy evaluation of Ross' hand function for employment purposes, testified that Ross lost about 60% of the functioning of his left hand because of the saw accident and stated that a human hand accounts for about 90% of the function of an arm. An arm accounts for about 60% of the body's total function.[1] Therefore, Dr. Galal estimated that Ross' hand injury deprived him of about 30% of total body functioning. Ross testified that he is unable to return to work as a bricklayer because of the injury.

## II. Post-trial Motions

B & D challenges the district court's denial of its post-trial motions for judgment notwithstanding the verdict ("JNOV") pursuant to Fed.R.Civ.P. 50(b) and for a new trial pursuant to Fed.R.Civ.P. 59. "In diversity cases, state law governs the standard of review of a denial of a motion for judgment notwithstanding the verdict." *Bilski v. Scientific Atlanta*, 964 F.2d 697, 699 n. 2 (7th Cir.1992) (citation omitted); *see also Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 714 (7th Cir.1992). "In a diversity action governed by Illinois law, judg-

---

1. These percentages correspond with statistics from the American Medical Association's Guides to the Evaluation of Permanent Impairment at 16 (3rd Ed.1990).

ment notwithstanding the verdict is appropriate only in those cases in which all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Bilski,* 964 F.2d at 699 (citations omitted); *Arcor,* 960 F.2d at 714. We review denials of JNOV motions *de novo. Fleming v. County of Kane,* 898 F.2d 553, 559 (7th Cir.1990).

Federal law governs the review of a motion for a new trial, even in diversity cases. *Hardin, Rodriguez & Boivin Anesthesiologists v. Paradigm Insurance Company,* 962 F.2d 628, 640 (7th Cir.1992). A new trial may be granted only if the jury's verdict is against the clear weight of the evidence. *Id.* We review a denial of a motion for a new trial under the deferential abuse of discretion standard. *Id.; Bilski,* 964 F.2d at 700.

With these standards of review in mind, we turn to the substantive law governing Ross' claim. In Illinois, to prevail in a product liability action, a plaintiff must demonstrate that (1) his injury resulted from the condition of the product; (2) the condition of the product was unreasonably dangerous; (3) the condition existed when it left the seller's control; and (4) the condition was the proximate cause of the injury. *Bilski,* 964 F.2d at 699 (citing *Pierce v. Hobart Corp.,* 159 Ill.App.3d 31, 111 Ill. Dec. 110, 112, 512 N.E.2d 14, 16 (1987)); *see also Aetna Insurance Co. v. Amilio Brothers Meat Co.,* 182 Ill.App.3d 863, 131 Ill.Dec. 332, 538 N.E.2d 707 (1989).

At trial, Ross argued that the B & D saw, as designed, manufactured and sold, was unreasonably dangerous because it lacked a necessary lower right side saw blade guard. On appeal, B & D makes one argument in support of its JNOV and new trial motions: that Ross failed to present any evidence supporting his theory that a right lower blade guard would have prevented his injury. B & D's trial strategy, which they now restate on appeal, was to argue that Ross' hand contacted the blade from *below,* and therefore a *side* right guard would not have prevented the injury.

In partial support of its theory, B & D points out that Ross was unable to recollect precisely how his hand came in contact with the saw blade. Ross remembered only releasing the saw's power button, reaching with his left hand for the piece of cut lumber to the right of the saw, and his hand somehow "drift[ing]" into the blade. B & D also points to the testimony of John L. Bennett, a retired 40–year employee of B & D who last served with the company as a safety assurance manager. In this capacity, one of Bennett's functions was to serve as an expert witness for B & D. According to Bennett, a lower right guard on the saw would not have prevented Ross' injury because Ross came into contact with the saw from below, and the guard would only have prevented contact with the saw from the side. Bennett came to this conclusion based upon his analysis of photographs of Ross' injured hand, and from his inspection of the saw's mechanism.

The plaintiff disputed the defendant's explanation for the injury, and argued that his left hand contacted the blade laterally from the right side of the saw and thus a lower-right blade guard would have prevented the injury. In support of his position, the plaintiff directs us to the testimony of Dr. Eriksson, who agreed that Ross' injury was consistent "with contact with a rotating saw blade with the thumb in an upward position and thereafter a rotation of the arm consistent with the grabbing of the saw blade resulting in the almost complete amputation, leaving only the skin bridge on top of the wrist". This factual scenario describes Ross' contact with the saw blade from the right side of the machine, rather than from under the saw. Donald L. Clark, a mechanical engineer formerly employed by B & D and one of the holders of the patent for the power miter saw which injured Ross, stated that he believed Ross' "left hand moved sideways into the still spinning blade." Another of the plaintiffs' expert witnesses was Stanley R. Kalin, a safety engineer and former deputy chief of the office of training and development at the Department of Labor's Occupational Safety and Health Administration in Washington, D.C. Kalin explained

that safety engineers specialize in "examining accidents and examining machines and processes and products to determine whether there is an unreasonable danger in the machine or in the process." In Kalin's opinion, the saw used by Ross "was defective and unreasonably dangerous due to the lack of a complete guard on the right-hand side of the blade" and that "the presence of a proper guard on the right-hand side of the blade would have prevented the injury to Mr. Ross."

The jury was thus presented with conflicting testimony as to how Ross' left hand came in contact with the blade. The defendant's witnesses maintained that contact was from below and therefore a right side guard would not have prevented the injury. The plaintiff's witnesses testified that the hand contacted the saw laterally and that a side guard would have spared Ross the injury. Given this conflicting testimony, the district court properly denied the defendant's motions for JNOV and for a new trial. B & D has merely demonstrated that the defendant's and plaintiff's experts disagreed about the way in which Ross suffered the serious and crippling injury to his left hand. The jury chose to believe the plaintiff's witnesses. As such, B & D has not met the standard required for a JNOV: that when viewing *the evidence in the light most favorable to Ross,* the evidence so overwhelmingly supported B & D's position that the liability verdict against B & D cannot stand. *See Bilski,* 964 F.2d at 699. Nor has B & D met the standard for a new trial: it has failed to demonstrate that the district court abused its discretion in concluding that the verdict was against the clear weight of the evidence. *See Hardin,* 962 F.2d at 640. The defendant's JNOV and new trial motions were properly denied.

### III.

B & D argues that the district court committed several evidentiary errors which require reversal of the jury verdict. "Even in diversity cases the rules of evidence applied in federal courts are the federal rules of evidence rather than state rules

..., save with respect to matters of presumptions, privilege, and competency of witnesses, Fed.R.Evid. 302, 501, 601, none of which is involved here." *Barron v. Ford Motor Company of Canada,* 965 F.2d 195, 198–99 (7th Cir.1992). We note that the Illinois Supreme Court has selectively adopted a large number of the Federal Rules of Evidence by decision and court rule. Michael H. Graham, *Cleary & Graham's Handbook of Illinois Evidence* xxxii (5th ed. 1990). The appellant carries a heavy burden in challenging a trial court's evidentiary rulings on appeal because a reviewing court gives special deference to the evidentiary rulings of the trial court. *Wheeler v. Sims,* 951 F.2d 796, 801–02 (7th Cir.1992), *cert. denied,* — U.S. 19 ——, 113 S.Ct. 320, 121 L.Ed.2d 241 (1992) (citation omitted). We will reverse such rulings only upon a showing that the trial court committed an abuse of discretion. *Id.* at 802. Moreover,

> "[u]nder the abuse of discretion standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place.... Rather, the abuse of discretion standard is met only when the trial judge's decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision, or where the supposed facts found are clearly erroneous."

*Id.* Our review is limited under Fed.R.Civ.P. 61 to whether an "error in either the admission or the exclusion of evidence was made which affected the substantial rights" of the defendant. *Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261, 1266 (7th Cir.1988). With this highly deferential standard of review in mind, we turn to the specific court rulings challenged by the defendant.

### A.

B & D argues that the district court abused its discretion when it permitted Ross to introduce evidence concerning an Underwriters Laboratory ("UL") safety standard, made effective in 1982, which required a lower right blade guard on pow-

er saws such as the one involved in the instant case. UL is an independent, not-for-profit organization which tests products and formulates safety standards which it then publishes. "Under both federal and Illinois law, compliance with applicable federal [safety] standards is relevant, though not conclusive, in a products liability case." *Schwartz v. American Honda Motor Company*, 710 F.2d 378, 383 (7th Cir.1983). Moreover, we note that under Illinois law, "evidence of standards may be relevant and admissible even though the standards have not been imposed by statute or promulgated by a regulatory body and therefore do not have the force of law." *Ruffiner v. Material Service Corporation*, 116 Ill.2d 53, 106 Ill.Dec. 781, 784, 506 N.E.2d 581, 584 (1987). In product liability actions such as the instant one, standards may be relevant in determining whether or not the condition of the product is unreasonably dangerous. *Id.*

Nevertheless, B & D maintains that the UL safety standard should not have been admitted into evidence because it became effective after the saw was manufactured. In support of this argument, B & D relies principally on an Illinois case, *Murphy v. Messerschmidt*, 68 Ill.2d 79, 11 Ill.Dec. 553, 368 N.E.2d 1299 (1977). In *Murphy*, the Illinois Supreme Court considered the admissibility of a building code adopted by a city ordinance in 1963 in a case involving the safety of an apartment building's steps which were constructed in 1952. *Id.* 11 Ill.Dec. at 14, 368 N.E.2d at 1302. The court ruled that the building code was inadmissible because it was not "relevant in terms of both time and conduct involved." *Id.* B & D maintains that *Murphy* established a blanket rule that safety standards adopted after the manufacture of a product are not admissible in product liability actions. We disagree. *Murphy* itself acknowledged that there were instances in which post-manufacture safety standards were relevant, for example when the plaintiff could show that a safety regulation was "designed to eliminate existing hazards as well as to prevent the creation of future ones." *Id.* Moreover, as the district court noted, *Murphy* was not a prod-

ucts liability case, but a negligence case. The focus in a products liability case, the district court pointed out, is on the "unreasonable dangerousness of the product. We are dealing with the relevancy of subsequent standards on the issue of 'unreasonably dangerous.' The fact that the standards were promulgated subsequent to manufacture goes to the weight and not to admissibility." We agree with the district court's reasoning, and refuse to hold that the court abused its discretion in admitting in evidence the 1982 UL safety standard as evidence of whether the power saw was unreasonably dangerous when manufactured. *See also Jones v. Black & Decker Manufacturing Company*, 202 Ill.App.3d 401, 147 Ill.Dec. 664, 665, 559 N.E.2d 1004, 1005 (1990) (in a wrongful death/products liability action, federal mining regulations which became effective after the manufacture of a wrench were relevant to the question whether the wrench was unreasonably dangerous); *Seward v. Griffin*, 116 Ill. App.3d 749, 72 Ill.Dec. 305, 314, 452 N.E.2d 558, 568 (1983) (federal safety standards which became effective after the manufacture of a van were relevant to the question whether the van was unreasonably dangerous).

### B.

■■■ B & D also argues that the district court erred in allowing evidence that B & D added a right lower blade guard to its saw once UL safety standards required it. Fed.R.Evid. 407 provides that:

"[w]hen, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

Thus, under Rule 407, post-manufacture remedial measures are admissible if the manufacturer disputes the feasibility of the

remedial measures. *Probus v. K–Mart, Inc.*, 794 F.2d 1207, 1210 (7th Cir.1986); *Flaminio v. Honda Motor Company*, 733 F.2d 463, 468 (7th Cir.1984). B & D claims it admitted the feasibility of the remedial measures it later took. It did not. The alleged "admission" occurred during adverse examination by the plaintiff of the defendant's expert *after* evidence of the subsequent remedial measure had been introduced by the plaintiff. B & D claims that it did not have an opportunity to admit feasibility until it presented its case, but we reject this argument. The defendant could have stipulated to the feasibility, or included the admission as an uncontested fact in the pretrial memorandum submitted by the parties, or in a pretrial motion accompanying the submission of the memorandum. It did not, nor did it make any objection when the district court ruled that the post-remedial measures would be admitted because the defendant contested feasibility. Because B & D made what has evolved into a tactical trial error by not stipulating to feasibility, this ruling was proper.

## C.

■ B & D also argues that the district court erred in allowing Ross to introduce evidence of two other accidents involving the defendant's power saw which occurred after Ross' accident. "Evidence of other accidents in products liability cases is relevant to show notice to the defendant of the danger, to show existence of the danger, and to show the cause of the accident." *Nachtsheim*, 847 F.2d at 1268. "However, before such evidence will be admitted, the proponent must show that the other accidents occurred under *substantially similar circumstances*." *Id.* The admission of such evidence lies within the sound discretion of the trial judge. *Id.* at 1269. We have reviewed the testimony relating to these two accidents and conclude that the circumstances surrounding the accidents were substantially similar to Ross'. Both involved hand injuries sustained while using the B & D power miter saw model involved in the instant case. We agree with the district court's ruling that Ross established that the other acci-

dents were sufficiently similar to his to qualify for admission. B & D also argues, without citation to any authority, that evidence of the two accidents should have been excluded because they occurred after Ross' injury. We reject this argument as well. The fact that the accidents occurred after Ross' injury does not make evidence concerning them any less probative of the unreasonably dangerous design and condition of the saw or of the cause of the accident. *Nachtsheim*, 847 F.2d at 1268.

## IV.

■ B & D argues that the district court erred in quashing the discovery deposition of Robert Ruth, a former B & D employee who supervised the design of the power saw prototype for mass production. "Our standard of review for the district court's decision not to allow additional pretrial discovery is abuse of discretion." *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1152 (7th Cir.1990). Only six days before the trial was scheduled to begin and two months after discovery had been closed, B & D sent a notice to Ross of its intention to depose Ruth. The deposition was scheduled to be held in Pennsylvania because Ruth was suffering from cancer and was unable to travel to Chicago from his home in Pennsylvania. The defendant asserted that Ruth would contradict the expected testimony of Clark, the former B & D mechanical engineer who headed the team of engineers designing the saw. Clark would testify that he advised Ruth, his superior at B & D, of the need for a lower right blade guard, but Ruth refused to allow him sufficient time to design a guard which would not reduce the saw's versatility.

The district court quashed the notice of deposition of Ruth. The court explained its decision in its order denying the defendant's post-trial motion:

> "[d]efendant contends that it was unaware of the whereabouts of Robert Ruth until a few days before trial and that the court therefore should have permitted defendant to take his evidence deposition for use during trial. Robert

Ruth was no stranger to defendant. He had been a high-level Black and Decker employee. He was on the patent for the power miter box saw at issue in this case. He was a retiree of the company to whom Black & Decker was presumably sending retirement checks. He was mentioned in the deposition of plaintiff's safety expert, Mr. Clark, at least 60 days before trial. The court believes that it is much more likely that ... defendant felt that Mr. Ruth was not needed as a witness. Defendant's contention that Ruth's whereabouts were unknown to Black and Decker until a few days before trial is incredible. The court stands by its refusal to let defendant take Mr. Ruth's evidence deposition a few days before trial."

After the court's refusal to allow the evidence deposition of Ruth, B & D informed the court that it could arrange to have Ruth's testimony broadcast live during trial over closed circuit television in a location a few blocks from the courthouse. This would have involved moving the trial to an undisclosed location in order to watch Ruth's testimony. In its ruling from the bench rejecting this proposal, the court stated, "I think by doing it this way [through closed circuit television at the undisclosed location] and highlighting his testimony would be awarding [B & D] for its lack of diligence, and it would be prejudicing the plaintiff...."

The district court did not err in quashing Ruth's discovery deposition or in refusing to allow his testimony via closed circuit television at a location removed from the courthouse. As the district court explained, the defendant's attorney created the problem through his lack of diligence in failing to obtain Ruth's deposition in a timely fashion. Ruth was obviously well-known to the defendant and its attorney. The failure to obtain Ruth's deposition in a timely manner should not have been rewarded by allowing Ruth to deliver his testimony through closed-circuit television at a location removed from the scene of the trial. The district court did not abuse its discretion in quashing Ruth's discovery deposition or in refusing to make extraordinary special arrangements for his testimony.

## V.

■ B & D objects to the district court's decision to allow the plaintiff to read excerpts of the testimony of a B & D employee, William F. Saffell, from another trial. Under Fed.R.Evid. 804(b)(1), if a witness is unavailable, his testimony "given as a witness at another hearing of ... a different proceeding" may be admitted "if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination."

B & D objected to the proposed Saffell testimony as cumulative and refused to produce its employee. Ross asserts that Saffell was not subject to the court's subpoena power because he resided outside the state of Illinois, and B & D does not contest that assertion. Ross therefore moved for permission to read Saffell's testimony from another trial to the jury, and the district court granted the motion. B & D objected, arguing that it would have produced the witness had the trial court so ordered.

B & D claims that the district court erred because it was unable to object to the testimony read by Ross' counsel and was thus prevented from "providing a full background and explanation of the circumstances surrounding [Saffell's] testimony, or from offering rebuttal testimony." We reject this contention. B & D could have called Saffell, a B & D employee, as its own witness in order to make any point about, or contradict or put into question, any of the testimony that had been read by Ross' counsel. It did not, and cannot now be heard to claim that the district court's decision to allow the testimony was reversible error.

## VI.

■ B & D also argues that the jury verdict should be reversed because the trial judge acted as an advocate for the plaintiff

when he sought to clarify a witness' testimony. The argument is preposterous. Under Fed.R.Evid. 614(b), a district court may interrogate a witness. The advisory notes to this provision state that a judge abuses his authority to question a witness when "the judge abandons his proper role, and assumes that of an advocate...." The alleged impermissible conduct by the trial judge occurred during B & D's cross examination of its former employee Clark. B & D attempted to introduce as evidence a portion of Clark's deposition testimony which it alleges impeached the witness. In his deposition, read by B & D's attorney at trial, Clark recalled his former supervisor Ruth saying that if the guard was not developed "in the neighborhood of four weeks" "we were going to stop development and release it and go into production without the lower right side blade guard." Apparently, B & D was attempting to demonstrate that this conversation could not have taken place because Ruth had left the company the year before the saw went into mass production. B & D argues that, according to Clark's deposition testimony, the saw went into mass production immediately after the four-week period Clark was given to re-design the product. However, the deposition transcript reflects that Clark merely stated that the product would be "release[d]" to go into production, not that production would begin immediately. Clark's trial testimony demonstrates that his recollection was that the process culminating in mass production would begin at the end of the four-week period, not mass production itself. When B & D's counsel asked him "[s]o what I'm trying to determine, sir, in that four-week period when it ended, culminated in mass production, in the real production run?", Clark answered, "[i]t allowed it to progress so that we did *eventually end up with mass production. There was a lot of other steps that had to be made.*" (emphasis added).

Ross' counsel objected to B & D's attempt to impeach. The district court indicated its agreement with Ross' objection, and then sought a clarification of Clark's testimony. The district court asked the witness, "[t]he inference isn't that he [Ruth] said that, okay, you got until June the 1st of 1974 to do this and on July the 1st of 1974 you start mass producing that thing. That was not the case, was it, sir?" The witness agreed with the court's characterization of his testimony.

A trial judge may not advocate on behalf of a plaintiff or a defendant, nor may he betray even a hint of favoritism toward either side. This scrupulous impartiality is not inconsistent with asking a question of a witness in an effort to make the testimony crystal clear for the jury. The trial judge need not sit on the bench like a mummy when his intervention would serve to clarify an issue for the jurors. The brief, impartial questioning of the witness by the judge, as the record reflects, to make the witness' testimony clearer was entirely proper, and B & D's assertion that the judge assumed the role of an advocate in this exchange is without merit.

## VII. Punitive Damages

B & D also challenges the jury's award of punitive damages, arguing that they should not have been allowed and, in the alternative, that the jury's award of $10,-000,000 in punitive damages was excessive. We will address each argument separately.

### A.

In a diversity action, state law determines whether punitive damages are appropriate. *West v. Western Casualty and Surety Company*, 846 F.2d 387, 398 (7th Cir.1988). Under Illinois law, "whether the circumstances in a particular case may justify an award of punitive damages is a question of law." *J.I. Case Co. v. McCartin–McAuliffe Plumbing & Heating, Inc.*, 118 Ill.2d 447, 114 Ill.Dec. 105, 108, 516 N.E.2d 260, 263 (1987). In Illinois, punitive damages may be awarded when the defendant acted "with fraud, actual malice, deliberate violence or oppression, or when the defendant act[ed] willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others". *Id.; Loitz v. Remington Arms Company, Inc.*, 138 Ill.2d 404, 150 Ill.Dec. 510, 515,

563 N.E.2d 397, 402 (1990) (citation omitted). "A defendant is guilty of willful and wanton conduct when he demonstrates knowledge that his conduct poses an increased risk of serious physical harm to another." *Huelsmann v. Berkowitz*, 210 Ill.App.3d 806, 154 Ill.Dec. 924, 929, 568 N.E.2d 1373, 1378 (1991). In the product liability context, punitive damages are appropriate if "the manufacturer's conduct evinced a flagrant disregard for public safety." *J.I. Case*, 114 Ill.Dec. at 108, 516 N.E.2d at 263. *See also Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 467 (1980) (Coffey, J., dissenting) (punitive damages are reserved for torts which "are malicious, outrageous or a wanton disregard of personal rights which require the added sanction of a punitive damage to deter others from committing acts against human dignity") (applying Wisconsin law) (citation omitted).

█ Ross argues that he demonstrated at trial that B & D's decision to manufacture and sell its saw without a lower right blade guard was in flagrant disregard of the safety of the public. Ross stresses the testimony of Clark, the former B & D mechanical engineer who oversaw the design and development of the prototype for the miter box saw. Clark testified that B & D knew that potential users of the saw were just as likely to secure a piece of lumber by placing their hand on the right as well as the left side of the saw's blade, thus making blade guards necessary on both the right and left sides of the lower blade. However, according to Clark, B & D officials refused to install a right lower blade guard in the saw's design because it would have limited the saw's ability to make certain kinds of cuts, thus diminishing the product's versatility and marketability. Clark testified that he had warned against producing the saw without the right lower blade guard, but was given too short a period of time to re-design the saw.[2] Clark stated that had he "been given enough time, I'm certain I could have come up" with a guard that would have protected its user and not diminished the saw's versatility. Impatient B & D officials, however, ordered him to proceed with the saw's development without the right lower blade guard. Clark described the saw that B & D eventually manufactured and sold as "unsafe and unreasonably dangerous" because of the lack of the lower right blade guard.

Ross also cites B & D's correspondence with UL[3] concerning the saw which injured Ross as further evidence that the defendant acted with flagrant disregard for the safety of the public. B & D policy requires that all its products meet UL standards. In July 1978, when the B & D saw which injured Ross was manufactured, no UL standards were in place that dealt specifically with power miter saws. In October, 1979, however, UL circulated to the manufacturers of power miter saws a proposed new standard requiring right and left lower guards. During the next fourteen months, B & D officials corresponded with UL officials in an attempt to persuade them that a lower right blade saw guard was not necessary. In an October 14, 1980 letter, for example, B & D officials argued that the saw's motor blocked visibility from the right side, making it unlikely that a user would attempt to secure the workpiece from the right side of the blade. UL officials responded that, based on their tests of the product, the motor did not sufficiently block visibility to prevent a user from attempting such cuts. In 1982, UL officially adopted the requirement of a lower right side blade guard. Soon after, B & D, in accordance with its policy of adhering to UL standards, was manufacturing its power miter saws with the lower right guard. Ross maintains that this correspondence with UL provides further evidence that B & D knew or had reason to know that its saw was unreasonably dangerous but resisted adding the lower right guard until it was in violation of UL's published stan-

---

**2.** The purpose of this attempted redesign was to create a right lower blade guard that would not diminish the saw's versatility.

**3.** As we noted above, UL is an independent organization which promulgates product safety standards.

dards. Since products that do not meet UL standards are at a competitive disadvantage, Ross maintains that the delay in B & D's re-design of the saw demonstrates that it was concerned with profits only, and not safety.

From our review of the record we are of the opinion that the Clark testimony and the UL correspondence were sufficient to support a judgment that B & D's conduct evinced a flagrant disregard for public safety; thus the jury's award of punitive damages was proper. *J.I. Case*, 114 Ill. Dec. at 108, 516 N.E.2d at 263. Despite internal warnings from Clark about the unreasonably dangerous condition of their saw, B & D officials decided to push ahead with production without a lower right blade guard and refused to grant Clark sufficient time to develop a versatile *and* safe design. B & D continued to manufacture the saw without the right blade guard in the face of the obvious view of the UL safety experts that a lower blade guard on the right side was needed. "Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future." *Loitz*, 150 Ill.Dec. at 515, 563 N.E.2d at 402. An award of punitive damages in the instant case would properly serve such a deterrent purpose.

### B.

■■■■ B & D argues in the alternative that the $10,000,000 punitive damages award was excessive and asks this court to lower the level of punitive damages by ordering a remittitur. In a diversity action, "the factors a jury may consider in determining the amount of punitive damages are governed by state law." *Cash v. Beltmann North American Company, Inc.*, 900 F.2d 109, 110 (1990). Federal law, however, governs the district court's review of the jury award and appellate review of the district court's decision. *Id.* We will review the district court's determination on the issue of the size of the jury verdict under an abuse of discretion standard. *Id.* When the district fails to apply

the appropriate factors to exercise its discretion, an abuse of discretion can occur. *Id.* Three factors are especially relevant in analyzing the amount of punitive damages awards under Illinois law: "(1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant resulting from multiple claims." *Hardin*, 962 F.2d at 640 (citing *Hazelwood v. Illinois Cent. Gulf. R.R.*, 114 Ill.App.3d 703, 71 Ill.Dec. 320, 328–29, 450 N.E.2d 1199, 1207–08 (1983)); *see also West*, 846 F.2d at 399. These three factors "are not, however, exhaustive. It is vital that each case be carefully assessed in light of the specific facts involved, and the ultimate determination should be governed by the circumstances of each particular case. Moreover, the underlying purpose of an award of punitive damages must be satisfied." *Deal v. Byford*, 127 Ill.2d 192, 130 Ill.Dec. 200, 205, 537 N.E.2d 267, 272 (1989). That purpose is "to punish the wrongdoer and to deter that party, and others, from committing similar acts in the future.... Because of their penal nature, punitive damages are not favored in the law, and courts must be cautious in seeing that they are not improperly or unwisely awarded." *Id.*

■■ The district court denied B & D's post-trial motion to remit a portion of the punitive damages award by stating that the award was not "excessive or unreasonable under the evidence." The district court provided no further explanation of its reasoning. In reviewing the district court's decision, we begin by analyzing the punitive damages award under the three factors set out by the Illinois Supreme Court in *Hazelwood*, 71 Ill.Dec. at 328–29, 450 N.E.2d at 1207–08. As to the nature and enormity of the wrong, B & D's refusal to modify its design in the face of Clark's internal warnings and UL's proposed safety standard is the sort of behavior by a manufacturer that justifies a jury's imposition of an award of punitive damages. As to B & D's financial status, Ross introduced evidence that as of December 31, 1990, B & D had a net worth of $1,933,608,-000 and that the company turned $51,095,-000 in profits in 1990 from the sale of

power tools. As to the third factor, B & D makes no claim that it may be subject to potential liability from multiple claims.

■ Nevertheless, focusing as we must on the particular circumstances of this case and keeping in mind that the purpose of punitive damages is to punish and deter, we conclude that the award of $10,000,000 is excessive and that the district court judge abused his discretion in refusing to modify it. We reach this conclusion in part because the saw which injured the plaintiff was not in violation of any UL standards as of the date of its manufacture or its sale to the general public (although it was in violation on the day Ross was injured), and this fact should have been taken into consideration as mitigating somewhat the wrong committed by B & D. Moreover, because punitive damages are not favored in the law, we must ensure that their award serves the purposes for which they are designed. An award of $5,000,000, representing roughly ten percent of B & D's 1990 power tool profits, is sufficient to serve the twin purposes of punishment and deterrence. Under the factual situation set forth herein, that amount is sufficient to dissuade B & D from behaving in a like manner again and puts a sufficient dent in its profits to serve as a fitting punishment. We have the same power to issue a remittitur as the trial court, *Cash*, 900 F.2d at 112, and therefore, in addition to AFFIRMING the jury's finding of liability against the defendant and its award of $2,000,000 in compensatory damages, we VACATE the jury's award of punitive damages, and REMAND the case to the district court with directions to enter an order for a new trial on the issue of punitive damages, unless the plaintiff Ross accepts a remittitur of the punitive damages to $5,000,000.

REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.