Gerald GRASSI and Marion Lord, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

INFORMATION RESOURCES, INC., John L. Malec, Gerald J. Eskin, et al., Defendants–Appellees.

No. 95–1035.

United States Court of Appeals, Seventh Circuit.

Argued May 9, 1995.

Decided Aug. 16, 1995.

Terry Rose Saunders (argued), George L. Saunders, Jr., Matthew E. Van Tine, Gwen A. Niedbalski, Saunders & Monroe, Chicago, IL, Peter Pearlman, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NY, for plaintiffs-appellants.

Michael D. Freeborn (argued), LeLand W. Hutchinson, Jr., Freeborn & Peters, Chicago, IL, for Information Resources Inc.

Steven L. Bashwiner (argued), Mary Ellen Hennessy, Katten, Muchin & Zavis, Chicago, IL, for John L. Malec, Gerald J. Eskin, Leonard M. Lodish and Gian M. Fulgoni.

Before ESCHBACH and MANION, Circuit Judges.[1]

ESCHBACH, Circuit Judge.

This is a class action securities fraud case in which a seven-week trial was held and a jury verdict was ultimately entered in favor of defendants. On appeal, plaintiffs contend that the district court erred in denying their motion for judgment as a matter of law, and they also challenge six separate evidentiary rulings of the trial court. For the reasons set forth below, we will affirm the district court on all grounds.

## I. Background

Information Resources, Inc. ("IRI") is a Chicago-based company engaged in the business of consumer research. Founded in 1977 by John Malec and Gerald Eskin, IRI has long competed for market share with the A.C. Nielsen Company ("Nielsen"). IRI first challenged Nielsen in 1979 with the introduction of BehaviorScan, an innovative system that used product bar codes to track and measure grocery store sales on a test market basis.

1. At the conclusion of oral argument, Judge Flaum recused himself and consequently did not participate in the panel conference nor in this opinion.

IRI went public in 1983, and the proceeds of this public offering were primarily used to expand IRI's research technology. IRI soon developed InfoScan, an outgrowth of BehaviorScan, which enabled IRI to gather and analyze market information on a national basis. IRI's revenues and profits were steadily increasing year after year when, in 1987, Nielsen's parent corporation, Dun & Bradstreet, offered to acquire IRI for $34 per share. IRI agreed to the deal, but the Federal Trade Commission ultimately blocked the acquisition as anticompetitive. During this time period, IRI experienced a financial downturn and its stock price plummeted.

John Malec had left IRI at the beginning of 1986, but IRI's Board of Directors asked him to return as IRI's CEO in November 1987 in order to spearhead the company's recovery. Malec agreed, and IRI soon began to show signs of a successful turnaround. On July 22, 1988, Malec issued a press release announcing that IRI had returned to profitability.

Then, on August 9, 1988, Malec learned that Jerry Newbrough, IRI's Chief Financial Officer, had made cash advances over the past year totalling approximately $2.6 million to an affiliated company called Medialink Parent, Inc. ("Medialink"). IRI had previously purchased 19% of Medialink's capital stock for approximately $1.86 million and had also guaranteed a bank loan to Medialink for $3 million. Medialink was a development stage company that was attempting to create a business communications system, and it was experiencing significant cash flow problems. On August 11, 1988, Malec reported to IRI's Board of Directors that IRI had a total of $8.1 million at risk in Medialink. Moreover, IRI's SEC Form 10–Q Report for the second quarter was due to be filed on August 15, 1988. After receiving professional advice from Pat Owens, IRI's Vice President of Finance, as well as from Grant Thornton, IRI's outside accounting firm, IRI disclosed the pertinent information regarding its investment in Medialink.

On October 12, 1988, after further consultation with Frank Walz, an audit partner at Grant Thornton, IRI officially acquired the remaining 81% of Medialink. IRI filed a Form 8–K with the SEC on the same day. IRI assumed effective management and voting control of Medialink, and a business plan was created to help determine the recoverability of IRI's Medialink investment. In the end, both IRI and Grant Thornton concluded that this investment should not be written off as a loss at this time because Medialink added substantial value to IRI. Thus, for purposes of IRI's 1988 financial statements, IRI reported $8.1 million of goodwill based on its acquisition of Medialink. This accounting treatment was based on Accounting Principles Board Rule 16 ("APB 16"), which provides that the amount of acquisition cost in excess of the acquired company's tangible assets is to be recorded as goodwill. IRI's 1988 financial results were first reported in a press release on February 6, 1989 and were later made fully available in the company's 1988 Form 10–K Annual Report filed on March 31, 1989.

At about the same time these 1988 financial statements were being released, IRI was also making earnings projections for 1989. On February 15, 1989, Dow Jones published IRI's 1989 earnings projections of approximately 50 cents per share, and John Malec made similar projections to analysts on or about March 8, 1989. As is typical in a securities fraud case, the company's performance failed to meet management's expectations. On April 27, 1989, IRI announced substantial first quarter losses, and the losses continued throughout the year. By the end of 1989, IRI decided to write off more than $8 million for its Medialink investment, and it showed a total annual loss of over $12 million.

Soon after IRI announced its first quarter losses for 1989, three separate class action suits were filed against IRI and many of its officers and directors. The district court consolidated these cases on July 19, 1989. The class representatives, on behalf of themselves and all other investors who purchased IRI common stock between February 6, 1989 and May 2, 1989 (the "class period"), alleged that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5, by mak-

ing certain material misrepresentations that caused the market price of IRI stock to be artificially inflated during the class period. Plaintiffs' securities fraud claim focused specifically on four allegedly misleading statements: two IRI statements projecting 1989 earnings of approximately 50 cents per share, and two IRI statements treating its $8.1 million acquisition of Medialink as goodwill for accounting purposes as opposed to writing off the entire investment as an $8.1 million loss.

After the parties had conducted more than four years of extensive discovery, a jury trial commenced on April 18, 1994. The district court bifurcated this case and reserved the issue of plaintiffs' reliance. The trial consisted of 21 actual trial days, during which a total of 28 witnesses testified, either in person or by deposition, and over 350 exhibits were admitted into evidence. Moreover, the district judge issued 19 separate written orders in this case, many dealing with the trial court's evidentiary rulings which plaintiffs now challenge on appeal. On June 7, 1994, the jury returned a special verdict finding that no fraud had been committed by any defendant with regard to each of the alleged misrepresentations.

Plaintiffs filed a post-trial motion for judgment as a matter of law, or in the alternative, for a new trial based on six allegedly erroneous evidentiary rulings of the district court. The district court denied this motion in its entirety, and plaintiffs filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  Analysis

### A.  Judgment as a matter of law

█ Plaintiffs contend that the district court erred in denying their post-trial motion for judgment as a matter of law. We review the denial of a motion for judgment as a matter of law *de novo, Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994), and our task is to determine "whether there is sufficient evidence, when combined with all inferences reasonably drawn, to support the jury's verdict when the evidence is viewed in the light most favorable to the nonmoving party." *Frazier v. Norfolk & Western Ry. Co.*, 996 F.2d 922, 924 (7th Cir.1993) (quoting *Siddiqi v. Leak*, 880 F.2d 904, 908 (7th Cir.1989)). We will not, however, "reweigh or reevaluate the evidence—that task is reserved to the jury as factfinder." *Id.*

Plaintiffs assert that the evidence shows, as a matter of law, that defendants made fraudulent misrepresentations regarding two basic subject matters: (1) IRI's projected earnings for 1989, and (2) IRI's acquisition of Medialink in 1988. With regard to IRI's 1989 earnings projection, plaintiffs specifically point to statements made on or about February 15, 1989 and on or about March 8, 1989, in which IRI projected year-end earnings of approximately 50 cents per share. Although we now know that this prediction of future earnings was inaccurate, the question is whether IRI's inaccurate earnings projection constitutes securities fraud.

█ Projections which turn out to be inaccurate are not fraudulent simply because later events show that a different projection would have been more reasonable. *See Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1132 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627– 28 (7th Cir.) ("there is no 'fraud by hindsight' "), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Moreover, "a company has no duty to update forward-looking statements merely because changing circumstances have proven them wrong." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 n. 9 (7th Cir.1995). Under the law in this circuit, in order to establish that IRI's 1989 earnings projection of 50 cents per share constituted a fraudulent misrepresentation, plaintiffs must show either that members of IRI's management did not genuinely believe the projection or that the projection lacked any reasonable basis at the time it was made. *See id.* at 1333 ("a projection can lead to liability under Rule 10b–5 only if it was not made in good faith or was made without a reasonable basis").

The evidence supports the conclusion that IRI management genuinely believed its 1989 earnings projection of 50 cents per share and

that this projection had a reasonable basis. Malec testified that, as IRI's CEO, he had run a "reality check on the numbers" and that his belief that IRI would earn 50 cents per share in 1989 "was as high as one can have for a forecast of the future." Malec further testified that there was "considerable basis" to this earnings projection and that as of March 8, 1989, he had received no financial information on which to alter his predictions. Indeed, the trial testimony of many IRI managers and employees corroborates Malec's assertion that IRI's 1989 forecast was made in good faith and based on reasonable assumptions.

At trial, IRI presented extensive evidence showing that its 50 cents per share earnings projection for 1989 was the result of the company's annual budget planning process which began in the fall of 1988. Malec testified that he consulted with IRI management before putting together a preliminary 1989 budget which projected total revenues of $161 million, or 50 cents a share. Gian Fulgoni, a top IRI executive, testified that this preliminary budget was then subject to much revision, discussion and negotiation—a give-and-take process that culminated in a two-day Management Committee meeting held in December 1988. After this meeting, all IRI managers signed off on the 1989 budget, which included the earnings projection of 50 cents per share. Numerous IRI representatives also testified at trial that this earnings projection was "attainable" and "reasonable." Moreover, plaintiffs failed to present any compelling evidence which would require as a matter of law a jury to find that IRI's 1989 earnings projection of 50 cents per share constituted a fraudulent misrepresentation.

■ Plaintiffs also contend that IRI committed fraud by issuing 1988 financial statements which were misleading because they treated IRI's $8.1 million acquisition of Medialink as goodwill instead of writing off this investment as worthless. In essence, plaintiffs claim that IRI engaged in deliberate accounting fraud to avoid showing a substantial loss in 1988. Specifically, plaintiffs allege that defendants knowingly or recklessly made misrepresentations or omissions of material facts in a February 6, 1989 press release regarding IRI's 1988 financial results as well as in the company's 1988 Form 10–K Annual Report filed on March 31, 1989.

At trial, IRI established that its financial statements had been approved by Grant Thornton, IRI's outside auditors, and the defendants also presented an accounting expert who testified that IRI's financial disclosures were appropriate. The accounting treatment of IRI's Medialink acquisition was based on APB 16, which provides that the amount in which the purchase price exceeds the value of the acquired company's tangible assets is to be allocated to goodwill. Plaintiffs argue that IRI's 1988 financial statements nonetheless should have reflected an $8.1 million write-off for its October 12, 1988 acquisition of Medialink because the acquired assets were worthless.

In *DiLeo,* plaintiffs' securities fraud claim alleged that certain bank loans should have been written off because they were likely to be uncollectible, and this court stated:

> For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.

*DiLeo,* 901 F.2d at 627. In the instant case, IRI wrote off its entire investment in Medialink by the end of 1989, after determining that this investment was worthless. Until that time, however, IRI treated its October 12, 1988 Medialink acquisition as goodwill for purposes of its financial statements. Plaintiffs essentially claim that IRI should have written off its bad investment sooner—but this is not fraud. The defendants' testimony indicated that IRI attempted to first determine what portion of its Medialink investment was recoverable before writing off the entire $8.1 million. The jury was certainly entitled to credit the defendants' evidence which showed that both IRI and Grant Thornton's Frank Walz concluded that the Medialink investment should not immediately

be written off as a loss because it added value to IRI.

Relying on a January 3, 1989 internal memorandum written by IRI's new Chief Financial Officer, Pat Owens, plaintiffs assert that IRI knew that there was no legitimate basis for treating Medialink as an asset for purposes of its 1988 financial statements. Plaintiffs portray this January 3rd memorandum as smoking gun evidence showing that defendants purposely engaged in some sort of creative accounting which amounts to fraud.[2] Owens, Harris, Malec, and Walz, however, all categorically rejected plaintiffs' interpretation of this memorandum. They testified that the January 3rd memorandum simply meant that Harris should try to come up with a business plan that made money as opposed to losing money, through such measures as cutting current expenses and re-prioritizing the company's projects. The jury could reasonably believe defendants' characterization of Owens's memorandum, and we will not reevaluate the evidence nor second guess the jury's credibility determinations.

In short, viewing the evidence in a light most favorable to the defendants, we conclude that there is sufficient evidence to support the jury's verdict. A reasonable jury could find that IRI's 1989 earnings projections were made in good faith and with a reasonable basis and that IRI's accounting treatment of its Medialink acquisition was not fraudulent.[3] Thus, the district court did not err in denying plaintiffs' motion for judgment as a matter of law.

## B. New trial based on district court's evidentiary rulings

Plaintiffs also contend that the district court erred in denying their alternative motion for a new trial. In arguing for a new trial, plaintiffs address six specific evidentiary rulings in which they claim the trial court committed reversible error. This court uses an abuse of discretion standard to review a district court's denial of a motion for a new trial. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991). Moreover, "[t]he appellant carries a heavy burden in challenging a trial court's evidentiary rulings on appeal because a reviewing court gives special deference to the evidentiary rulings of the trial court." *Klonowski v. Int'l Armament Corp.*, 17 F.3d 992, 995 (7th Cir. 1994) (quoting *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1183 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993)). We conclude that the district court did not abuse its discretion with regard to any of the challenged rulings.

### 1. Plaintiffs' "equity infusion" argument

■ Plaintiffs assert that the district court abused its discretion in refusing to permit plaintiffs to show that IRI had a motive to inflate its stock price because it was attempting to raise additional capital through an equity infusion from outside investors. The district court ruled that plaintiffs were barred from presenting evidence regarding this "equity infusion" argument because it was not set forth in plaintiffs' trial brief. The court's ruling was based on Rule 5.00 of the General Rules of the U.S. District Court for the Northern District of Illinois, and specifically footnote 11, which reads:

> Except as previously approved by the Court, no party's trial brief shall exceed 15

---

**2.** The memorandum was addressed from Pat Owens to Brian Harris, the IRI manager who was put in charge of creating a business plan to help determine the recoverability of IRI's Medialink investment, and in pertinent part it reads:
> As you know, the 1989 plan for Medialink currently shows a $600,000 net operating loss for the entity. This is not exactly the direction that we would hope this company would be going in if the $8 million has worth. You should look at the 1989 plan for Medialink and have them begin to turn a profit in the third and fourth quarters rather than breaking even, as currently suggested. I realize that you and

the folks at Medialink have put together some plans for 1989. Perhaps you can begin to forecast a little further out some of the returns that the company will generate for us. We may also want to include in our plan the possibility of turning the company profitable and selling it to a third party as one way to recoup our $8 + million investment.

**3.** Defendants also argue that plaintiffs failed to show loss causation; however, we need *not* reach this issue in light of our previous conclusion.

pages. Trial briefs are intended to provide full and complete disclosure of the parties' respective theories of the case. Accordingly each trial brief shall include statements of (a) the nature of the case, (b) the contested facts the party expects the evidence will establish, (c) the party's theory of liability or defense based on those facts and the uncontested facts, (d) the party's theory of damages or other relief in the event liability is established and (e) the party's theory of any anticipated motion for directed verdict. It shall also include citations of authorities in support of each theory stated in the brief. Any theory of liability or defense that is not expressed in a party's trial brief will be deemed waived.

Such local rules are binding and have the force of law. *See Weil v. Neary,* 278 U.S. 160, 169, 49 S.Ct. 144, 148, 73 L.Ed. 243 (1929); *United States v. Yonkers Bd. of Educ.,* 747 F.2d 111, 112 (2d Cir.1984).

■ Plaintiffs argue that they satisfied footnote 11 to Rule 5.00 by setting forth their broad legal theories, and they insist that they were not required to address such specifics as the defendants' motive to inflate IRI's stock price. The district court, however, emphasized that plaintiffs failed to even generally identify the equity infusion theory in their 15–page trial brief. Moreover, plaintiffs' trial brief highlights defendants' "insider trading" motive, and it also discusses an additional motive theory regarding IRI's impending default on its loan covenants. Nonetheless, it makes no mention of the theory of an equity infusion motive. The district court therefore ruled that plaintiffs could not advance this new theory at trial, and we conclude that this was not an abuse of the court's discretion.

### 2. IRI's 1988 tax return

■ Plaintiffs also contend that the district court abused its discretion in excluding evidence regarding IRI's corporate 1988 tax return. Plaintiffs wanted to submit the tax return into evidence in order to show that IRI took a tax deduction of $6.3 million for uncollectible debts based on its cash advances to Medialink. The district court excluded this evidence pursuant to Federal Rule of Evidence 403 after it concluded that any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and undue delay. Fed.R.Evid. 403.

In a six-page memorandum opinion and order denying plaintiffs' evidentiary request, the district court explained that "admitting IRI's 1988 corporate tax return was especially problematic." Plaintiffs did not request IRI's tax return until after the trial had already commenced, and the court would have had to allow the defendants to retain and present their own expert. Also, the court noted that it was arguable whether the plaintiffs' expert, Professor Dan Givoly, had any particular expertise with regard to this type of tax matter. Moreover, the probative value of IRI's tax return, which was filed in June of 1989, is questionable since plaintiffs were claiming that IRI's management knew, at the end of 1988, that the Medialink investment was worthless. Finally, there was also a concern that the evidence would unfairly prejudice the defendants by suggesting possible tax fraud, which was not an issue in the case. In short, the district court did not abuse its discretion in using Rule 403 to exclude from evidence IRI's 1988 tax return.

### 3. Medialink loan guarantee documents

■ Similarly, plaintiffs contend that the district court abused its discretion in excluding the Medialink loan guarantee documents. These documents were executed by IRI's CFO on August 21, 1987, in favor of The Chase Manhattan Bank. Plaintiffs claim that these documents show that IRI management did not knowingly approve the Medialink loan guarantee and that the guarantee was therefore unauthorized. The district court concluded, however, that the 1987 documents were too remote in time, and it excluded them from evidence under Rule 403.

These 1987 loan guarantee documents can only have limited probative value as to whether defendants acted properly in booking the October 12, 1988 acquisition of Medialink as goodwill instead of taking an immediate write-off. Moreover, the district court explained to the parties that it would

grant some latitude in showing Medialink's connection to the alleged fraud, but it was concerned that too much emphasis was being placed on the defendants' bad business judgment. The facts surrounding the Medialink loan guarantee were adequately disclosed in IRI's Form 10–Q for the third quarter of 1988, which was submitted into evidence as Defendants' Exhibit 144. Thus, the district court did not abuse its discretion in excluding the 1987 loan guarantee documents from evidence based on Rule 403.

### 4. IRI's post-class period financial results

The district court allowed defendants to present evidence of IRI's favorable financial results and stock price information for the years 1990 and 1991, even though the class period ended on May 2, 1989. Plaintiffs filed a motion in limine requesting that the district court exclude this evidence because the jury could improperly rely on the post-class period increase in IRI's stock price to conclude that the plaintiff-shareholders were not actually damaged. In the alternative, plaintiffs argued that if the trial court admitted this post-class period financial information, then the court should also admit evidence showing that IRI's stock price fell again in 1994.

■ The district court issued a four-page order denying both of plaintiffs' evidentiary requests. The court noted that one of the claimed misrepresentations in plaintiffs' trial brief was that John Malec had stated that IRI had "strong fundamentals," and defendants offered the deposition testimony of several analysts who stated that such "fundamentals" relate to a company's financial outlook for the next 12 to 24 months. The district court therefore determined that evidence regarding IRI's financial results for 1990 and 1991 were probative as to the accuracy of Malec's alleged misrepresentation and as to his lack of scienter. Moreover, to reduce any unfair prejudice, the court gave the jury limiting instructions explaining that this post-class period evidence was unrelated to plaintiffs' damages. IRI's 1994 financial results were deemed irrelevant because Malec's comment about "strong fundamentals" did not extend as far as five years into the

future. We conclude that the district court acted well within its discretion in admitting IRI's financial results from 1990 and 1991, but excluding those from 1994.

### 5. Supplemental reports of plaintiffs' expert witness

■ Plaintiffs' contend that the district court abused its discretion in barring two supplemental reports offered by plaintiffs' accounting expert, Professor Givoly. Plaintiffs tendered Professor Givoly's supplemental reports to the court on April 15 and April 22, 1994—just as the trial was commencing. As the district court pointed out in its eight-page order excluding these two new reports, Federal Rule of Civil Procedure 26(e)(1) requires that such supplemental information be provided 30 days prior to trial. *See* Fed. R.Civ.P. 26(e)(1); *Patel v. Gayes,* 984 F.2d 214, 221 (7th Cir.1993) ("Under the Federal Rules, the district court has the discretion to impose sanctions on a party if that party fails to meet the requirements of Rule 26.").

The district court explained that it decided to exclude Professor Givoly's supplemental reports because (1) Professor Givoly's prior report had not been supplemented 30 days prior to trial, (2) the April 15 and April 22 supplemental reports introduced expert testimony that was being offered for an entirely new purpose, i.e., valuation, and (3) the reports contained too many editorial comments and conclusory remarks which would need to be stricken. Plaintiffs blame their untimeliness on the fact that defendants produced several new documents on short notice, but the district court examined the time frame and still determined that the supplemental reports were submitted "much too late." Nonetheless, in an effort to be fair to plaintiffs, the district court did allow Professor Givoly to refer to the newly-produced documents during his testimony as further support for his opinions. Again, we must conclude that the district court acted well within its discretion.

### 6. Attorney-client privilege and additional discovery

■ Two weeks prior to trial, plaintiffs filed a motion for an order limiting defen-

dants' use of the attorney-client privilege and permitting additional discovery of certain documents that contained attorney-client communications regarding IRI's investment in Medialink. In support of their motion, plaintiffs argued that the attorney-client privilege should not protect these documents (1) because it was waived, (2) because of the crime-fraud exception, and (3) because of the public disclosure exception. The defendants responded that even if plaintiffs' motion had any merit, it was untimely because it should have been filed years ago when the basis for the motion was first known. Moreover, the defendants explained that the attorney-client privilege issue had not previously been raised because the parties had a tacit agreement that plaintiffs would not press for any attorney-client privilege material so long as the defendants did not assert the "advice of counsel" defense.

After briefing and oral argument, the district court denied plaintiffs' request to conduct additional discovery because the court determined that plaintiffs' motion was untimely. The court explained its decision in a nine-page memorandum opinion and order:

> [A]t oral argument, it became clear that limitation of the attorney-client privilege had not been raised previously because counsel did, in fact, have some type of tacit understanding. Several times during oral argument, plaintiffs' counsel indicated that they had only brought the motion for additional discovery when it became apparent that defendants would rely on advice of counsel at trial to excuse their alleged fraud. Also, the briefs and supporting documentation showed that plaintiffs could have raised these issues much earlier in the case. For example, both Eskin and Fulgoni had suggested that they relied on counsel's advice in deciding which disclosures to make. Also, at his July 13, 1992 deposition, Malec refused to answer questions regarding the substance of conversations with his attorney regarding IRI's disclosure obligations. Based upon the foregoing, the court agreed that plaintiffs'

motion was untimely. (footnotes and citations omitted).

"Our standard of review for the district court's decision not to allow additional pretrial discovery is abuse of discretion." *Ross*, 977 F.2d at 1185 (quoting *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1152 (7th Cir. 1990)).

On appeal, plaintiffs argue that the district court's ruling is incorrect because they did not have a basis to challenge the attorney-client privilege until the defendants produced several new documents just months before trial. Defendants claim, to the contrary, that plaintiffs knew about the lawyers' involvement in the Medialink acquisition much earlier in the case and that plaintiffs did not learn anything new from the documents produced just before trial. After reviewing the record, we cannot say that the district court abused its discretion in determining that plaintiffs should have requested these documents at some earlier point during the four years of discovery that preceded this trial.[4] *See Ross*, 977 F.2d at 1185 (holding that the district court did not abuse its discretion in refusing to allow defendant to depose a witness since discovery had been closed for a month and defendant had failed to diligently obtain the deposition in a timely fashion); *Olive Can Co., Inc.*, 906 F.2d at 1152–53 (holding that the district court did not abuse its discretion in denying further discovery where five years of discovery had already taken place and plaintiffs were on notice of the issue in question).

### III.

For the reasons above, we AFFIRM the judgment of the district court on all grounds.

---

**4.** In light of our conclusion, we need not reach the merits of plaintiffs' attorney-client privilege

arguments regarding waiver, the crime-fraud exception, and the public disclosure exception.