In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1100

JACKIE J. WEIR,

Plaintiff/Appellant,

v.

CROWN EQUIPMENT CORPORATION,

Defendant/Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. TH 95-12-C M/H--Larry J. McKinney, Judge.

Argued December 7, 1999--Decided June 15, 2000

Before HARLINGTON WOOD, JR., RIPPLE, and ROVNER,
Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.  This is a
product liability action arising out of an
accident on September 1, 1998 in which plaintiff-
appellant Jackie J. Weir ("Ms. Weir") injured her
left foot while operating a forklift, Model R.S.
standup rider, manufactured by defendant-appellee
Crown Equipment Corporation ("Crown"). The case
was first filed in Indiana state court by Ms.
Weir, and then removed by Crown on diversity
grounds. A trial by jury resulted in a verdict
for Crown.

  Appealing, Ms. Weir raises two issues, both
involving the exclusion by the district court of
evidence offered by her. The district court
excluded all except for a small portion of
accident reports turned over by Crown in
discovery detailing prior forklift accidents.
Also excluded was testimony by Ms. Weir's experts
to the effect that the absence of a door on the
forklift operator's compartment constituted a
design defect contributing to Ms. Weir's injury.

FACTS

    A.  The Equipment
    At the time of her injury, Ms. Weir was
employed as a material handler using the forklift
in a warehouse owned by a corporation not a party
to this action. It is first necessary to
understand what a standup forklift is, and what
it is designed to do./1 It is a compact

electric-powered mobile machine with an adjustable forklift extending from one of the sides. The forklift extension can be used to lift warehouse materials from the floor and then to transport them anywhere in the warehouse. The operator stands in a compartment which has two pedals, a power-on pedal and a brake pedal. At trial, the brake pedal was sometimes referred to as the "deadman brake," but in any event that name fortunately has no relationship to this case. The operator's right foot operates the power-on pedal which is located toward the front of the operator's compartment. The operator's left foot operates the brake pedal located toward the rear of the compartment closer to the compartment opening which is used by the operator for entering and exiting the compartment.

Other features of this forklift must be noted. It was designed for narrow aisle warehouse/industrial use. The forklift uses a side-standing position for the operator, permitting good visibility in both forward and reverse positions by looking to the right or left without changing body position. The entrance/exit is an opening on the side opposite the forklift raising and lowering mechanism. That opening is one of the issues in this case. The other three sides of the compartment are protected by a steel wrap-around with a steel-cantilevered overhead guard above the compartment to protect the operator from any falling objects. The actual operation of the forklift is controlled by a multi-function control handle ("handle"), also located within the operator's compartment, by which the operator controls both forward and reverse movement and speed. The handle will automatically return to neutral when the operator releases her grip on the handle which cuts the power. The handle also controls the directional movement of the forklift.

The two primary methods to stop the forklift are different concepts than used for passenger automobiles. By reversing the handle through and past neutral in a direction opposite to what the forklift has been traveling, the forklift decelerates and slows to a stop. At trial this procedure was referred to as "plugging" or "reversing motion." The other method of stopping is by activating the spring-levered brake pedal on the floor of the compartment. To use this method, the operator bends her left knee which raises the heel of her left foot permitting the brake to rise. This lessening of the brake pressure shuts off the power to the traction motor and activates the brake. Conversely, when the operator straightens her left knee thereby pressing the brake pedal down to the floor, the brake pads disengage from the brake drum,

releasing the brake. The depression of the brake pedal also restores travel power. This will be recognized as a different system than is employed in passenger automobiles, but operators, including Ms. Weir, are trained in these procedures. Part of Ms. Weir's training was designed to teach her to keep her hands and feet inside the compartment during movement and not to dismount if the forklift was still in motion. At the time of the accident, Ms. Weir had about eleven months experience using the forklift in question.

B.   The Accident

The morning of the accident after arriving for work, Ms. Weir says she went to her forklift and conducted a pre-operational inspection confirming that both brake systems worked properly. Ms. Weir then used the forklift in the performance of her duties in the warehouse for about six hours until around noon. That operation required the frequent use of the braking systems, and during that use, Ms. Weir did not discern any brake problems. Just before lunch, Ms. Weir parked her forklift, took a short break, and then reentered her machine. She turned on the power and proceeded as usual with the open exit or entrance to the front and the forks, therefore, in a trailing position. Ms. Weir made two right turns, cautiously coming to a stop at the intersections before making the turns. As she approached a third turn, Ms. Weir again stopped to check the clearance for her machine before turning into the aisle where the accident was waiting to happen. No brake problems were experienced. After going around that last turn Ms. Weir saw another forklift parked near the end of the aisle, which she estimated roughly to be thirty-five to forty feet away. It was her intention to stop and get out of her forklift and then to walk over to, enter, and move the parked forklift out of the way. She described the speed of her forklift at this time as proceeding "very slowly" or "barely moving." Ms. Weir claims she attempted to stop her forklift, first by plugging and then with the deadman brake, as she approached the parked forklift, but both braking systems failed, causing an impact with the parked forklift. She describes it as a "collision" with the parked forklift; however, given the speed of her forklift as described by Ms. Weir, the accident may be better characterized as a bump. Ms. Weir explains her left foot injury occurred when the two forklifts collided, pinning her left foot between the two machines. In her complaint Ms. Weir alleges her "left foot was caught between the two forklifts" and she "was seriously injured." After this accident her forklift was immediately taken out of service. A technician

inspected and drove the forklift, testing the braking systems at various speeds and directions. The brakes functioned properly. Finding no defects, Ms. Weir's forklift was restored to service without the need for any repairs or adjustments.

Ms. Weir in her 1995 deposition testified that immediately before the accident her right foot had been on the power-on pedal on her right and with her left foot she had released the deadman brake to activate the brake. Again, at trial she confirmed her belief that her right and left feet had been in their proper positions as she had previously stated in her deposition. However, she added the qualification, "I didn't look , but yes." That she worked the brakes properly but unsuccessfully was the original basis of her claim that the accident was caused by the failure of both braking systems. The qualification about her not actually looking at her feet to see where they were was something she would not be expected to do either when driving a passenger car or a forklift.

Additional testimony raised questions about Ms. Weir's explanation of the accident. She testified that when she saw the parked forklift she intended to stop some distance away from the parked machine, dismount her forklift, and then walk over, enter, and move the parked forklift out of the way. Her forklift, she says, did not stop but kept moving slowly, very slowly, ahead until it collided with the other machine, resulting in her foot injury. A co-worker witness cast some doubt on Ms. Weir's collision theory by testifying that after the "collision" the two machines were not touching but were two to three inches apart. Added to these circumstances is the fact that Ms. Weir's machine was lined up with the parked machine opening to opening, which suggests the possibility that Ms. Weir approached the parked vehicle slowly as she said but then deliberately stopped close enough to the other machine to step directly from her machine into the parked machine, but in doing so slipped and injured her foot.

Ms. Weir testified that when she hit the parked forklift, her left foot must have gotten between the two machines. She testified on direct that she believed her left foot had been within the compartment immediately prior to the collision, "but she didn't look down." Then she felt a lot of pain in her left foot and knew her foot was cut, but she could not recall where her left foot was caught between the two machines, again explaining, "I didn't look down." Following the accident, Ms. Weir was taken to an emergency room where an x-ray disclosed no broken bones. Her

cuts were stitched, and she was released the same day. No bone had been crushed as might have been expected if her foot had been outside and caught between the two heavy machines during a collision.

Ms. Weir alleged her forklift was defective and dangerous principally for two reasons. The first was explained in jury instructions given without objection as follows:

[W]hen the brake pedal of the "forklift" is raised very slightly, the electric drive motor is disconnected and the driver is unable to stop the rider by plugging (reversing the motor). If the operator's right foot is crossed over onto the brake pedal at that point, the brake pedal will not rise high enough for the brake to engage, but is high enough to disconnect the drive motor.

It is the left foot, as previously explained, which is to be used to activate the brake pedal by the operator bending her left knee which raises her left heel permitting the brake pedal to rise, activating the brake and shutting off the power. Ms. Weir's experts hypothesized that her right foot inadvertently crossed over to the brake pedal. That prevented the brake from rising high enough to engage, but, despite the cross-over, the pedal could rise high enough to disconnect the drive motor, disabling the plugging feature and resulting in total brake failure. That, it is argued, was the first defect contributing to Ms. Weir's injury.

The other alleged defect concerned the absence of a barrier on the exit/entrance opening to and from the operator's compartment. Ms. Weir desired to show, through expert testimony, that had there been a barrier on the entrance/exit it would have prevented her injury and, furthermore, that the use of a barrier was a cost-effective remedy. The district court excluded all of the barrier evidence, and an offering of proof was made by one of Ms. Weir's experts.

ANALYSIS

First, we consider the district court's exclusion from evidence of certain Crown records, specifically accident reports, sought to be introduced by Ms. Weir at trial. During discovery, Crown turned over more than 1,000 reports of accidents dealing with Crown forklifts. These reports typically were generated by dealers, service people, salespeople, and owners of Crown forklifts who either experienced or learned of accidents involving Crown forklifts and then compiled information regarding these accidents into reports. In a pretrial order, the

court stated that it would allow only those reports which detailed "a failure of the brakes to operate under the circumstances facing Wier [sic]." When asked for clarification of this ruling during trial, the district court stated that it would allow into evidence those accident reports which involved a failure both of the plugging mechanism and of the deadman brake together with pre- and post-accident testing showing both brakes to be working. During the direct examination of one of Ms. Weir's expert witnesses, counsel for Weir identified 162 accident reports. However, after the expert conceded that some of those reports did not involve both plugging and deadman brake failure, the district court admitted only twenty-seven of the reports into evidence.

"Evidence which is not relevant is not admissible." Fed. R. Evid. 402. However, even relevant evidence may be excluded based on "the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "Evidence of other accidents in products liability cases is relevant to show notice to the defendant of the danger, to show existence of the danger, and to show the cause of the accident." Nachtsheim v. Beech Aircraft Corp., 847 F.2d 1261, 1268 (7th Cir. 1988); see also Ross v. Black & Decker, Inc., 977 F.2d 1178, 1185 (7th Cir. 1992). "However, before such evidence will be admitted, the proponent must show that the other accidents occurred under substantially similar circumstances." Nachtsheim, 847 F.2d at 1268 (emphasis in original). We review a district court's decision to admit such evidence for abuse of discretion. Ross, 977 F.2d at 1185. In the present case, the accident reports were intended to show that the type of Crown forklift in question was dangerous based on a showing that these forklifts suffered from a design defect which resulted in brake failures such as that which allegedly caused Ms. Weir's injury.

In Nachtsheim, this court explained its view of substantial similarity as well as can be said:

The foundational requirement that the proponent of similar accidents evidence must establish substantial similarity before the evidence will be admitted is especially important in cases such as this where the evidence is proffered to show the existence of a dangerous condition or causation. The rationale for this rule is simple. In such cases, the jury is invited to infer from the presence of other accidents (1) that a dangerous condition existed (2) which caused the

accident. As the circumstances and conditions of the other accidents become less similar to the accident under consideration, the probative force of such evidence decreases. At the same time, the danger that the evidence will be unfairly prejudicial remains. The jury might infer from evidence of the prior accident alone that ultra-hazardous conditions existed . . . and were the cause of the later accident without those issues ever having been proved. In addition, the costs-- in terms of time, distraction and, possibly, prejudice-- resulting from such evidence also may weigh against admissibility.

Nachtsheim, 847 F.2d at 1268-69 (internal quotations and citations omitted).

While Ms. Weir argues that the district court misapplied the substantial similarity test by adding additional criteria beyond mere brake failure, we disagree. Ms. Weir's theory of the case, developed through the testimony of her experts, was that the forklift was unreasonably dangerous based on a design defect which resulted in brake failure in cases of cross-over as described above. One of Ms. Weir's experts, Daniel Pacheco, was a consulting engineer with experience in the design of forklifts and the investigation of forklift accidents. Ms. Weir sought to show by Pacheco's testimony that when the deadman brake pedal operated by the left foot is raised only slightly the electric drive motor is disconnected, disabling the plugging feature, and, yet, the deadman brake does not engage to stop the machine. Pacheco and another of Ms. Weir's experts, Dr. William Ovens, observed that the malfunction of the deadman brake resulting from a slight elevation of the brake could be caused by the operator's right foot being "inadvertently" crossed over onto the left brake pedal which, as previously noted, is intended for the operator's left foot, not the right./2 The testimony of Ms. Weir herself is that she gave the machine a brake test before she used the machine and had no braking problems during its morning use, none until she claims the brakes failed as she approached the parked forklift. After the accident, the machine was taken out of service for testing, and the brake systems functioned properly. There was no mechanical misfunction detected or broken parts discovered. Given these facts, the district court did not abuse its discretion in limiting the accident reports admitted to those involving a failure both of the plugging mechanism and of the deadman brake together with pre- and post-accident testing showing both brakes to be working.

In its order on Ms. Weir's motion for a new trial, the district court gave Fed. R. Evid. 802

as an additional basis for its exclusion of the accident reports. As the district court noted, the accident reports were of all kinds and were not created exclusively by Crown but rather collected from a variety of sources. The reports were not uniform and contained different levels of detail. These reports were viewed by the trial judge as out-of-court statements by declarants who were not present to testify about the truth of their reports. There was an obvious hearsay problem under Fed. R. Evid. 802, and, therefore, the reports would not be admissible unless covered by an exception under Fed. R. Evid. 803. In her brief on appeal, Ms. Weir asserts that the reports were not excludable under Fed. R. Evid. 802 because they "are expressly excepted by Rule 803(6)." Merely asserting that the reports were a "report" of "events, conditions, opinions, or diagnosis, made at the time or near the time" by "a person with knowledge" and kept in the course of a regularly conducted business activity and that it was "the regular practice of that business activity to make the report" is insufficient to satisfy Fed. R. Evid. 803(6). As we mentioned, these reports were collected by Crown from a myriad of sources and in a variety of circumstances. The district court personally examined the reports and found many to be vague, incomplete, and otherwise confusing. The district court resolved the dilemma by admitting twenty-seven of the reports which were of occurrences substantially similar to the Weir accident. To have dumped all of these hearsay accident reports about various brake problems on the jury would have caused untold juror confusion and possible prejudice. The accident reports that were admitted as being substantially similar to her accident were adequate to make Ms. Weir's point.

The one issue which remains to be discussed concerns the evidence involving the absence of a door on the open side of the operator's compartment. Ms. Weir attempted to show, through expert testimony, that a barrier of some sort across the open side of the forklift could and would have prevented her injury and was a cost-effective remedy. Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), the district judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

Before Ms. Weir's experts testified at trial, there was a detailed discussion on the record regarding the admissibility of the expert testimony. During this discussion, the court stated that any evidence relating to a barrier across the open side of the forklift was irrelevant and inadmissible because the evidence in the case was that Ms. Weir's foot was outside

of the running lines of the machine before the collision and that it was not outside the machine because of the impact as claimed. The court expressly noted, given Ms. Weir's testimony that her foot was pinned between the machines, it would have been "impossible" for her foot to have been forced outside the operator's compartment by the impact and then pinned between the machines; thus a possible door was irrelevant./3 At this point, counsel for Ms. Weir highlighted the distinction between the two alternative design theories that had been proposed relating to the barrier issue. The first alternative design involved a door across the open side of the operator's compartment. Counsel noted that Crown had sold over 300 of these doors for standup forklifts and that these doors had been in actual use in the field. He informed the court that Pacheco had studied accident reports from these door-equipped forklifts which showed that none had been involved in collisions resulting in lower limb injury. The second alternative design was a wedge-shaped barrier which Ms. Weir's experts developed.

During the discussion at trial, counsel for Ms. Weir drew the court's attention to the fact that its order on Crown's motion in limine did not expressly address admissibility of the first alternative design theory which, as previously noted, involved doors that were in actual production and use. The court reaffirmed its belief that any barrier evidence was irrelevant given the facts of the case and excluded any expert testimony on the issue. Ms. Weir then presented an offer of proof in which Pacheco testified about both the doors and the wedge. Pacheco testified that, based on the information he had reviewed, none of the forklifts equipped with actual doors "encountered a collision accident that resulted in a lower limb injury." While Pacheco did not specifically identify the source of the information he reviewed, it appears that this opinion was based for the most part on information contained in Crown accident report forms. Pacheco also stated that he had recently reviewed approximately twenty accident reports that had never been submitted to Crown, but rather had been compiled by K-Mart, a Crown customer, relating to accidents involving door-equipped forklifts. The judge did not say so, but these reports were no doubt subject to the same disabilities as the other reports collected from a variety of sources.

Following Pacheco's trial testimony, Ms. Weir once again asked the court to reconsider its ruling prohibiting testimony on the barrier issue. The court declined, stating that Ms. Weir testified that "she voluntarily put her foot

outside the compartment." Following a recess, the court corrected itself, stating "I don't think there is anywhere in there where Mrs. Weir said she voluntarily put her foot outside the thing," but again declined to change its ruling for other reasons already stated.

Ms. Weir concedes that the evidence relating to the second alternative design, the wedge, was properly excluded because it had not been thoroughly tested. However, Ms. Weir argues that the district court erred in excluding Pacheco's testimony regarding the doors. Once again, our review is for abuse of discretion. Kumho Tire Co., Ltd. v. Carmichael, 119 S.Ct. 1167, 1176 (1999).

In reviewing the door issue it must be noted that one of Ms. Weir's experts, Dr. Ovens, stated in a deposition that he did not think that a door was a good idea. Some of the prior factual review is applicable to this issue as well. Ms. Weir testified on direct examination that, to the best of her knowledge, her left foot was inside the truck as the collision began, but noted that she did not look down. On cross-examination, Ms. Weir testified as follows:

Q:  And at the time of the impact your foot, or at least part of your foot, was outside the compartment?

A:  I never looked down, sir, I don't know. My foot was caught between the two trucks. If that is what you are getting at, yes.

Ms. Weir testified that there was no swerving, acceleration, bumping, or rough floor to traverse immediately before the collision which could have forced her foot outside of the operator's compartment. In fact, she had no explanation of how her foot got out of the compartment. Ms. Weir admitted that as a part of her training, she was instructed to keep her feet inside the operator's compartment when the forklift was in operation and that, up to this point, she had never had a problem doing so. Additionally, Pacheco testified that in his opinion nothing occurred to force Ms. Weir's left foot outside the operator compartment and stated that he believed "her left foot, because she thought she had applied the brake, inadvertently got outside of the compartment."

In view of the fact Ms. Weir's machine was moving "very slowly" and there were no claimed steering problems, yet the openings of the two machines were lined up and the machines were only a few inches apart, it was possible for the jury to view the evidence as suggesting Ms. Weir intended to take her machine close enough to the

other to be able to step into the parked machine from her forklift and move it more quickly and conveniently than if she had parked her forklift, dismounted, and then walked over to and climbed into the parked machine. If that interpretation was possible under the evidence, it was Ms. Weir's disregard of the rules and her own negligence in stepping from one machine to the other which caused her injury, not the absence of a barrier.

Indiana courts apply a "doctrine of crashworthiness" under which a manufacturer may be held liable for injuries sustained in an accident where a manufacturing or design defect, although not the cause of the accident, caused or enhanced a plaintiff's injuries. Miller v. Todd, 551 N.E.2d 1139, 1140 (Ind. 1990).

Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design.

Id. at 1142 (quoting Larsen v. General Motors Corp., 391 F.2d 495, 503 (8th Cir. 1968)). A product is not considered to be defective under a crashworthiness analysis merely because the product failed and caused injury. Instead, a finding of defectiveness is based on the conclusion "that the product failed to provide the consumer with reasonable protection under the circumstances surrounding a particular accident." Id. at 1143. Therefore, "a claimant should be able to demonstrate that a feasible, safer, more practicable product design would have afforded better protection." Id.

There was no evidence that the circumstances surrounding the accident caused Ms. Weir's foot to leave the operator's compartment. Both of Ms. Weir's experts testified that her injury could have been avoided if she would have stayed within the compartment. It is clear that the operator's compartment, even without a door, provided reasonable protection under the circumstances of Ms. Weir's accident. It should be remembered that Ms. Weir first was sure her feet were inside the operator's compartment and in their proper places on the pedals at the time of impact. She later qualified that by saying that she did not actually look at her feet. However, during her cross-examination, Ms. Weir claimed she did not know where her foot was at the time of impact because she did not look down, but then stated that her foot was outside of the operator's

compartment because it got caught between the machines. Ms. Weir's own testimony was one of the weaknesses of her case, and she had the burden of proof. The district court's exclusion ruling could serve to keep the jury from being confused and misled, and possibly from reaching an unjustified sympathy verdict for plaintiff. Any alleged design defect which had nothing to do with plaintiff's injury is irrelevant. The district court did not abuse its discretion in excluding this evidence as lacking sufficient foundation.

Affirmed.

FOOTNOTES

/1 See Appendix for an illustration of a forklift substantially similar to the one Ms. Weir was operating.

/2 Neither expert interviewed Ms. Weir concerning the placement of her feet before formulating the cross-over theory. Ms. Weir's testimony both in her deposition and at trial was that her right and left feet had been in their proper positions immediately prior to the accident.

/3 The court stated that, given the evidence presented, the notion that Ms. Weir's foot was thrown outside the operator's compartment by the impact did not carry any "credibility." When considered in context, it is clear that the district court was not engaging in improper credibility determinations but rather holding that the evidence presented did not support such a theory. In fact, immediately prior to making this determination, the district judge recognized in his analysis of the admissibility of the cross-over evidence that the credibility of Ms. Weir's testimony was an issue for the jury, adding that if it were up to him he would have to find that Ms. Weir was "simply not credible."


RIPPLE, Circuit Judge, dissenting. I respectfully cannot accept all of the majority's analysis. In my view, the district court improperly rejected Pacheco's testimony about the need for a door on the rider. Accordingly, I would reverse and remand for a new trial.

I agree with the majority's analysis about the district court's exclusion of certain accident reports. The district court has broad discretion to decide which accident reports are relevant. "Even when substantial identity of the circumstances is proven, the admissibility of such evidence lies within the discretion of the

trial judge." Nachtsheim v. Beech Aircraft Co., 847 F.2d 1261, 1269 (7th Cir. 1988). As the majority correctly notes, the reports admitted were sufficient for Ms. Weir to make her point.

The district court's decision to exclude Daniel Pacheco's proposed testimony about the need for a door on the rider cannot, however, be sustained even under the deferential review that we accord to trial court determinations about the admissibility of evidence./1 The court excluded that part of Pacheco's testimony because it found that it was inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993). In examining the correctness of that determination, we must first place the district court's ruling in context and then examine the criteria of Daubert.

A.

As the majority observes, Indiana courts recognize the doctrine of crashworthiness. See Indiana Code Ann. sec. 33-1-1.5-1 et seq. (West 1996) (product liability); Miller v. Todd, 551 N.E.2d 1139, 1142 (Ind. 1990); see also Whitted v. General Motors Corp., 58 F.3d 1200, 1205-06 (7th Cir. 1995). The Indiana Supreme Court has summarized the doctrine as follows:

Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design.

Miller, 551 N.E.2d at 1142 (citation omitted). Thus, even if Ms. Weir's cross-over theory was rejected by the jury, Ms. Weir could recover from Crown if she succeeded in showing that the rider was not crashworthy.

In a crashworthiness case, the plaintiff must show that the injury caused by the product was "a natural and probable consequence which was, or should have been, reasonably foreseen or anticipated in light of the attendant circumstances." Marshall v. Clark Equip. Co., 680 N.E.2d 1102, 1108 (Ind. Ct. App. 1997). Ms. Weir could have recovered from Crown if Crown should have anticipated that the absence of a door on the rider would lead to the type of injury she suffered. Crown may defend, however, by showing that Ms. Weir misused the product in an unforeseeable manner. See id. Thus, even if Crown is correct that Ms. Weir intentionally had placed her foot outside the rider, the critical inquiry

for purposes of determining whether the rider is crashworthy is whether Ms. Weir's misuse was reasonably foreseeable.

The Indiana Court of Appeals' decision in Marshall is instructive. In that case, the plaintiff was injured while backing up a forklift. See 680 N.E.2d at 1103-04. The plaintiff argued that the forklift's design was defective because it did not include a rear door. See id. at 1108. The defendants presented a misuse defense, arguing that the plaintiff had improperly operated the forklift with his foot outside the driver's compartment. See id. The court found that the jury was required to determine "whether Marshall's misuse of the forklift was reasonably foreseeable." Id. "The foreseeability of an intervening misuse is usually a question for the jury." Underly v. Advance Mach. Co., 605 N.E.2d 1186, 1189 (Ind. Ct. App. 1993); see also Montgomery Ward & Co. v. Gregg, 554 N.E.2d 1145, 1156 (Ind. Ct. App. 1990).

The district court acknowledged Ms. Weir's crashworthiness theory in a pretrial order on Crown's motion in limine to exclude portions of Pacheco's testimony. The court stated, "'Design defect' cases frequently arise in the context of an enhanced injury to the plaintiff caused by the absence of an alleged safety feature or alternative design that would have prevented the injury." R.208 at 2. The court later connected the doctrine to Pacheco's proffered testimony, stating that the lack of a barrier over the doorway "falls in the category of 'injury enhancing' defects." Id. at 4. It then noted that plaintiffs in an enhanced injury case must demonstrate, through a "risk-utility" test, that there was a more cost effective alternative design available. Id.

At trial the district court made plain that it did not think Ms. Weir could proceed with her crashworthiness claim:

Let me just mention this. I thought I made it fairly clear that the crash worthiness circumstance, or any problem with the crash worthiness was not really what we were going to do. Any part of the design that you would have thought aggravated the injury was out because you have got to build something, you have to test it, you have to go through all the activities to be sure that your theory is correct. I think that is clear from the case law. I'm not making this stuff up. So I don't anticipate entertaining evidence about that.

R.213 at 344-45. It appears from this statement,

read in isolation, that the district court's basis for dismissing Ms. Weir's crashworthiness claim was that she had not constructed an alternate model. Such a ruling surely would have been inappropriate on this record. When the alternate model discussed by an expert is in regular commercial production, the expert cannot be faulted for not building his own prototype, but instead is allowed to evaluate data relating to the existing models./2 After trial, however, the district court explicitly stated that it had not based its ruling at trial on the fact that Ms. Weir's experts had not constructed a model of their own. Indeed, when Ms. Weir moved for a new trial, the district court explained that its basis for dismissing the crashworthiness claim was the fact that Ms. Weir had offered no cost/benefit analysis to demonstrate that a door should have been added to the rider.

This circuit has acknowledged that, in order to demonstrate a defect under Indiana law, a plaintiff must perform a cost/benefit analysis. See Pries v. Honda Motor Co., 31 F.3d 543, 545 (7th Cir. 1994) ("To demonstrate a defect, the plaintiff must compare the costs and benefits of alternative designs."). Pacheco presented such an analysis in his offer of proof. He testified that the cost of the doors would be only a small percentage of the total cost of the forklift. He stated that accidents involving riders caused lower limb injuries./3 He testified further that he had read numerous reports of crashes involving riders with doors, and in none of them had the operator suffered an injury to their lower extremities. Pacheco compared the costs of riders with and without doors, and also compared the accident benefits of each. In fact, counsel specifically asked Pacheco if the benefits of doors on riders outweighed their costs, and Pacheco answered yes.

Because of this proffered testimony, it was incorrect, unless the requirements of Daubert were not met, for the district court to conclude that the plaintiff had offered no cost/benefit analysis. We have stated that plaintiffs must offer a more cost-effective design, and Ms. Weir has fulfilled that obligation. See Anderson v. P.A. Radocy & Sons, Inc., 67 F.3d 619, 625 n.5 (7th Cir. 1995). Crown argues that Pacheco is wrong, and that riders with doors were not more cost-effective than those without; indeed, another of Ms. Weir's own experts, Dr. William Ovens, testified that adding a door would create numerous problems with the rider. However, there was evidence in the record from which a reasonable juror could have concluded that a rider with a door was more cost-effective than one without. It was for the trier of fact to

evaluate this testimony.

B.

Having determined that Ms. Weir should have been allowed to present her crashworthiness argument to the jury, I now consider whether Pacheco's testimony should have been admitted to support that argument. I focus here only on that portion of Pacheco's testimony in which he testified that the addition of a door to the rider would have helped prevent Ms. Weir's injury./4

To be admissible as expert testimony, Pacheco's testimony must be based upon valid scientific knowledge that would assist the trier of fact with a matter at issue. See Daubert, 509 U.S. at 592-93; Walker v. Soo Line R.R. Co., 208 F.3d 581, 586 (7th Cir. 2000). Although Pacheco's qualifications are not at issue in this case, a district court may reject a proffered expert as unqualified. See United States v. Vitek Supply Corp., 144 F.3d 476, 486 (7th Cir. 1998). Even if an expert is qualified, he need not be allowed to testify on all subjects. This court has warned about the dangers of allowing qualified experts to offer opinions that do not rely on proper methodologies and are therefore speculative. See Cummins v. Lyle Indus., 93 F.3d 363, 368 (7th Cir. 1996); Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996). Further, a district court may conclude that the testimony would not assist the trier of fact with a matter at issue, essentially a relevancy determination. See United States v. Shay, 57 F.3d 126, 132-33 (1st Cir. 1995).

1.

As an initial matter, it is not clear that the district court ever applied the Daubert standards to this portion of Pacheco's proffered testimony. This court has reversed district court decisions that do not show a proper consideration of the Daubert factors. See United States v. Hall, 165 F.3d 1095, 1102 (7th Cir. 1999) (describing earlier proceedings in that case). Here, the court properly evaluated another portion of Pacheco's proffered testimony, his proposed self-designed alternate design. The court's order does not, however, discuss the subject of Pacheco's study of accident reports involving forklifts with compartment doors. There is no point in the record at which the district court specifically considers the scientific value of this proffered testimony.

Of course, a district court's ruling is not defective simply because it failed to recite the

Daubert standards. See Walker, 208 F.3d at 590. Our focus must be on whether the district court has applied the principles of Daubert to the proffered testimony at issue. See Walker, 208 F.3d at 590; Hall, 165 F.3d at 1102. Here, the district court, although properly rejecting other parts of Pacheco's testimony, simply did not discuss specifically the proffered testimony at issue.

2.

In the absence of any explanation from the district court, its ruling is unknown. However, assuming that it considered under Daubert this portion of Pacheco's proposed testimony, it would have determined whether Pacheco's methodology was scientifically valid and whether that testimony would have assisted the trier of fact with a matter at issue. In the following discussion, therefore, I shall assume, arguendo, that the district court would have concluded that Pacheco's testimony failed both prongs of the Daubert analysis. Neither conclusion can be sustained even under our deferential review of such questions.

In the district court's evaluation of the admissibility of expert testimony, "the focus . . . must be solely on the principles and methodology, not on the conclusions they generate." Cummins, 93 F.3d at 370 (quoting Daubert, 509 U.S. at 595). In his offer of proof, Pacheco testified that he has studied the protection afforded by doors that previously have been available on forklifts. He claimed to have reviewed accident reports of forklifts involving doors and found no such accidents that caused an injury to the lower extremities. Further, from those records he determined that injuries were frequent on riders without doors.

Pacheco relied on data from accident reports to determine that more injuries occurred in crashes involving riders without doors than in crashes involving riders with doors. Review of reports and records is an appropriate method for experts to learn the data about which they plan to testify. See Walker, 208 F.3d at 591. For testimony based on reports to be admissible, the reports themselves must be reliable sources of information. Federal Rule of Evidence 703 demands that experts obtaining data from reports use only reports reasonably relied on by experts in the field. See Fed. R. Evid. 703; United States v. Gardner, No. 99-2193, 2000 WL 528331, at *5 (7th Cir. May 3, 2000). There does not appear to be any dispute that these accident reports are reasonably relied upon for the purpose of obtaining data about rider accidents. First, most

of the reports were prepared by Crown itself for the purpose of compiling safety histories of its products./5 Second, when considering Ms. Weir's cross-over theory, the district court admitted numerous accident reports into evidence, as discussed in the majority opinion. Although Crown objected that some of these accident reports were irrelevant to the cross-over theory, it has not argued that these reports were unreliable. These reports fulfill the mandate of Rule 703 as materials reasonably relied upon by experts in the field.

Crown focuses on the fact that Pacheco did not cite any articles supporting his position or address contrary authority stating that doors are unnecessary on forklifts. In a Daubert analysis, it helps to have cited articles; it is not, however, required. The fact that professional organizations disagree with Pacheco about the need for doors--another point raised by Crown-- is a proper subject for cross-examination, and Crown could have countered Pacheco's testimony with experts of its own. That concern goes to the weight of Pacheco's testimony, not its admissibility.

3.

Even though Pacheco's testimony was based on appropriate scientific methodology, the district court properly could have rejected it if it would not assist the trier of fact with a matter at issue in the case. As discussed above, the district court erred in concluding that the crashworthiness of the rider was not a matter at issue in the case. However, had the district court allowed the crashworthiness theory to proceed, the existence of a more cost-effective and crashworthy alternate design would have been a matter at issue. Establishing the viability of an alternate design is necessary to show proximate cause. See Marshall, 680 N.E.2d at 1108. In this regard, Pacheco's testimony would have helped Ms. Weir to show that a more cost-effective alternative design would have been more crashworthy: he testified that a forklift with a door could have prevented Ms. Weir's injury and that it would have only taken a minimal expense to improve dramatically the rider's safety./6 Had the jury been allowed to consider the crashworthiness issue, Pacheco's testimony would have assisted the jury to decide whether a rider with a door would have been more cost-effective and more crashworthy.

The admissibility of Pacheco's testimony is not affected by the fact that he did not testify about the foreseeability of any misuse by Ms. Weir. In a crashworthiness case, unforeseeable

misuse is an affirmative defense. See Marshall, 680 N.E.2d at 1108; Montgomery Ward, 554 N.E.2d at 1151-52. The existence of a superior alternate design was an essential element of Ms. Weir's claim; when the district court prevented her from pursuing that argument, it eliminated the need for Crown to raise any affirmative defenses. Further, had Crown raised the defense of unforeseeable misuse, it would have had the burden of proving that Ms. Weir's misuse was not foreseeable. When an affirmative defense is raised the burden is on the defendant to establish its elements. See Schleibaum v. K-Mart Corp., 153 F.3d 496, 501 (7th Cir. 1998); Get-N-Go, Inc. v. Markins, 544 N.E.2d 484, 486 (Ind. 1989). Because the district court never allowed the unforeseeable misuse defense to be raised, and because, even if the defense had been raised, Ms. Weir would have been under no obligation to enter testimony on the subject, the fact that Pacheco did not discuss the foreseeability of any misuse does not affect our consideration of whether Pacheco's testimony would have assisted the trier of fact with a matter at issue.

Crown argues that Pacheco's testimony was properly rejected because he argued that, even with a door, the rider would have been defective because it did not include a ridge between foot pedals. The testimony about a ridge, however, was directed toward showing how Crown could have prevented a brake failure; his testimony about compartment doors was directed toward showing how Crown could minimize the potential for injury in the event of a brake failure. Whether Pacheco thought that the rider would still be defective if a door was added was immaterial; what was important was his scientifically-grounded testimony that the addition of a door would reduce the chance of injury to lower extremities in the event of a crash.

The majority's conclusion that Pacheco's testimony was properly excluded rests in part on the fact that the district court was attempting to minimize confusion over Ms. Weir's contradictory statements about the position of her feet. It is true that Ms. Weir's own testimony on the subject of the position of her feet at the time of the crash was inconsistent. However, even if we indulge in the assumption most favorable to Crown--that Ms. Weir intentionally placed her foot outside the running lines of the rider--Pacheco's testimony about the need for a door on the rider was still relevant because a jury could have concluded that Crown's design caused an enhancement to Ms. Weir's injury and awarded her partial recovery under Indiana's crashworthiness doctrine. This would not be "an unjustified sympathy verdict," as the majority

characterizes it, but would instead be exactly the sort of recovery the crashworthiness doctrine was intended to facilitate. Therefore, this design defect was not irrelevant to Ms. Weir's injury.

Pacheco's opinion on the need for doors on the forklift was grounded in proper research methodologies and should have been admitted. From this testimony, a reasonable jury could have inferred that, even if the forklift's brakes failed, Ms. Weir's injury could have been prevented by Crown. I would remand the case for a new trial at which this portion of Pacheco's testimony would be admitted.

FOOTNOTES

/1 Pacheco also at one point offered testimony about an elaborate design change, and on appeal Ms. Weir concedes that the district court correctly excluded that testimony.

/2 In design defect cases, courts have frequently noted the testimony of experts comparing allegedly defective products to safer designs already in existence. See Chaulk v. Volkswagen of America, 808 F.2d 639, 642-43 (7th Cir. 1986); accord Violette v. Smith & Nephew Dyonics, Inc., 62 F.3d 8, 13 (1st Cir. 1995); Miles v. Olin Corp., 922 F.2d 1221, 1227 (5th Cir. 1991); Johnson v. Colt Indus. Operating Corp., 797 F.2d 1530, 1535 (10th Cir. 1986); Martin v. Michelin N. Am., 92 F. Supp. 2d 745, 752 (E.D. Tenn. 2000) (memorandum); Bush v. Michelin Tire Corp., 963 F. Supp. 1436, 1446 (W.D. Ky. 1996) (memorandum).

/3 Pacheco was allowed to testify at trial about the dangers of riding forklifts. Pacheco testified that forklift accidents occur at "a fairly high frequency," and that when one occurs there is "a very great chance that the injury will be very serious." R.218 at 613.

/4 See note 1, supra.

/5 Some of the accident reports relied upon by Pacheco in evaluating injuries on forklifts with doors came from K-Mart, a Crown customer.

/6 Pacheco's testimony about the need for a door was relevant only to a crashworthiness claim; there is no argument that the absence of a door caused Ms. Weir's rider to collide with the parked rider.


APPENDIX